ORIGINAL
D∈F
C IM

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
MARK SYRKIN,

                Plaintiff,

     -against-

STATE UNIVERSITY OF NEW YORK,
ROBERT L. KING, in his official capacity as
Chancellor of the State University of New
York, and/or his successor(s), and JOHN W.
CRAINE, JR., in his official capacity as
President or Interim President of the State
University of New York Maritime College,
and/or his successor(s),

                Defendants.
-----------------------------------------------------------x

**MEMORANDUM AND ORDER**
Case No. 04-CV-4336 (FB) (RML)

*Appearances:*
*For the Plaintiff:*
JAMES M. MALONEY, ESQ.
33 Bayview Avenue
Port Washington, NY 11050

*For the Defendants:*
CLEMENT J. COLUCCI, ESQ.
Assistant Attorney General
New York State Attorney General
120 Broadway, 24th Floor
New York, NY 10271

**BLOCK, Senior District Judge:**

      Plaintiff, Mark Syrkin ("Syrkin"), alleges that defendants Robert L. King ("King") and John W. Craine, Jr. ("Craine"), violated his Fourteenth Amendment right to be free from intentional discrimination by failing to renew his appointment as a physics professor at the Maritime College ("College") of the State University of New York ("SUNY") based his sex and/or his national origin. King and Craine move for summary judgment pursuant to Federal Rule of Civil Procedure 56, arguing that Syrkin has failed

to adduce sufficient evidence to support a finding that his termination was based on unlawful discrimination. For the following reasons, the motion is granted.

I

The following undisputed, material facts are taken from the parties' Rule 56.1 statements and supporting documentation:

## A. Syrkin's Employment and Termination

In 1990, Syrkin, a man of Russian national origin, was hired as an adjunct assistant professor of physics in the College's Science Department. In 1996, he was promoted to assistant professor, a tenure-track position.

In 2002, the chair of the Science Department, along with departmental and college-wide advisory committees, recommended to Craine, the College's interim president, that Syrkin be promoted to associate professor and given a continuing appointment.[1] However, Interim Provost Jeffrey A. Weiss ("Weiss"), who is not a defendant, recommended to Craine that Syrkin's appointment not be renewed; the rationale for his recommendation was as follows:

> The Science Department offers courses in Mathematics, Physics, Chemistry, and Meteorology, among other disciplines. The College's Marine Environmental Science (MES) degree program is offered by the Science Department.
>
> The MES degree program has historically graduated a

---

[1] "Continuing appointment" is SUNY's official term for tenure. *See* N.Y. Comp. Codes R. & Regs. tit. 8, § 335.2 ("A continuing appointment shall be an appointment to a position of academic rank which shall not be affected by changes in such rank and shall continue until resignation, retirement or termination.").

2

> disproportionately small number of undergraduate students. This trend continues. This is despite the fact that the Science Department incurs very substantial personnel service expenses. By way of example, the Science Department's personnel service expenses for fiscal year 2001-2002 was one of the largest at the College.
>
> The College is faced with the challenge of supporting numerous programs, despite limited financial resources. In view of this programmatic challenge, and overall pressing financial issues, I respectfully submit that the College should not continue to support an additional full time faculty member in the Science Department.

Affirmation of Clement J. Colucci, Ex. 19. In an affidavit prepared in connection with this litigation, Weiss stated that both he and Craine knew that Syrkin "had been hired as a physics teacher and that physics, and not the MES program, was his major responsibility." Aff. of Jeffrey A. Weiss ¶ 22. He further stated that he saw the MES program as related to Syrkin's tenure decision "only in the sense that they both exemplified what [he] believed to be a need to cut back in the 'service' disciplines and concentrate scarce resources on [the College's] central programs." *Id.*

On May 9, 2002, Weiss advised Syrkin by letter that Craine had "decided not to renew [his] term appointment past its current expiration date of August 31, 2003." Colucci Affirmation, Ex. 20. In response to Syrkin's request for a written statement of reasons, Craine stated that he "fully concur[red]" with Weiss' reasons, and that his decision "ar[ose] out of the College's overall programmatic needs." *Id.*, Ex. 22.

Although decision-making authority over the renewal of Syrkin's appointment rested with Craine, *see* N.Y. Comp. Codes R. & Regs. tit. 8, § 335.12 ("All term appointments shall be made by the chief administrative officer of the college and shall be

3

reported to the chancellor."), the collective bargaining agreement ("CBA") between SUNY and its faculty provided for an appeal to SUNY's chancellor. Syrkin invoked this procedure and appealed Craine's decision to then-Chancellor King.

King, in turn, convened an three-member advisory committee. Under the CBA, the advisory committee was "not . . . empowered to determine the correctness of determinations of the College President involving matters other than the employee's performance or competence." Colucci Affirmation, Ex. 23, § 33.4(e)(2). Thus, for non-renewals that "involved matters of program," the advisory committee's role was to be limited to "the sole question of whether the notice of non-renewal was in fact based upon such considerations when issued." *Id.*

The advisory committee unanimously recommended reversing Craine's decision. In so doing, it addressed the merits of the reasoning offered by Weiss and adopted by Craine, concluding that Syrkin's dismissal could not be justified on budgetary or programmatic grounds. The committee also noted that Syrkin was "'not a member of the MES faculty, a concept that was fully misunderstood by [Weiss] in making his recommendation." *Id.*, Ex. 26.

King rejected the advisory committee's recommendation; on May 5, 2003, he sent Syrkin a letter informing him that "it is my conclusion that Interim President Craine has taken a reasonable and defendable action in your situation, and I, therefore, affirm his decision." *Id.*, Ex. 27.

## B. Other Staffing Decisions

While Syrkin's appeal to the chancellor was pending, another physics professor, Dr. Kenneth Stanton ("Stanton"), unexpectedly retired. This left the Science Department with three full-time physics professors. In January 2003, Dr. Joseph Hoffman ("Hoffman"), the new chair of the Science Department, sent a memorandum outlining the Department's goals and objectives to Dr. Robert Kraushaar ("Kraushaar"), who had replaced Weiss as interim provost. As stated in the memorandum, the "immediate full-time staff needs of the Department [were] to hire an oceanography professor who can also teach introductory chemistry courses and a 40-hour per week physics technician," Colucci Affirmation, Ex. 9; the oceanographer was a necessary part of Hoffman's plan to expand the MES program, while the technician was needed to "keep [the department's] physics laboratories operational." *Id.* The memorandum further stated that recent curriculum changes would "reduce the required number of full-time physics instructors to three," and that there were "no plans to hire additional full-time teaching staff in physics in the near future." *Id.*

Later that year, however, the members of the Science Department asked Hoffman to add an additional full-time physics professor to his staffing requests; in an email dated October 8, 2003, he agreed "to make a case for. . . an Asst. Prof. of Physics to handle the increased physics load when the current freshmen become sophomores." *Id.*, Ex. 10. Hoffman was skeptical that Kraushaar would approve the funding for both a physics lab technician and a full-time physics instructor. *See* Aff. of Joseph C. Hoffman ¶ 19 ("If we obtained funding for the laboratory technician, it would be highly unlikely that

5

the Science Department would also receive funding for a new full-time physics professor, and I advised the Department of this, but as Department Chair I was obliged to advocate for what the Department wanted.").

As Hoffman had predicted, Kraushaar denied the request for an additional physics professor; however, he approved the requests for a full-time oceanography professor and a lab technician. His decision with respect to the oceanographer was based in part on his view of the MES program: While Weiss "had advocated eliminating the MES program and reallocating the resources devoted to it toward other programs more central to [the College's] mission," Kraushaar "believed that expanding the program, rather than eliminating it, was the better course." Aff. of Robert Kraushaar ¶ 12.

Kraushaar's decisions were also driven by a "noticeable increase in the academic budget from the previous year." *Id.* ¶ 16. When Syrkin's tenure decision was made, SUNY had given Weiss a budget for full-time staff that was "approximately $250,000 lower than the previous year's." *Id.* Hoffman's budget, by contrast, was more than $600,000 greater than Weiss'. *See* Colucci Affirmation, Ex. 11 (Academic Budget Summary, 2000-2007).[2]

---

[2] At his deposition, Weiss testified that in recommending that Syrkin not be granted tenure, he had relied on "documents describing the college's academic budget," but that he no longer had them. Dep. of Jeffrey A. Weiss at 10-12. Although defendants have submitted summaries of the College's academic budgets, Syrkin faults them for being unable to provide copies of the precise documents that Weiss relied on. It is undisputed, however, that the College maintains its budget in electronic form, and that budgetary data "can be reported in a wide variety of ways, in varying levels of detail." Aff. of Joseph L. Schaefer ¶ 3. In the absence of any dispute that the figures listed in the summaries are accurate, the Court attributes no significance to the defendants' inability to produce the exact pieces of paper that Weiss reviewed.

While the searches for an oceanographer and lab technician proceeded, one of Syrkin's former colleagues in the Science Department – Dr. Kathy Olszewski ("Olszewski") – came up for tenure. Kraushaar described the decision to recommend tenure for Olszewski, the sole chemist in the department, as "an easy one," Kraushaar Aff., ¶ 19; due to the increase in his budget, he was able to make his recommendation "strictly on the academic merits." *Id.* ¶ 20. Kraushaar's recommendation was accepted by Admiral John Ryan ("Ryan"), who had replaced King as the College's president.

Kraushaar stepped down as interim provost in January 2004, and was replaced by William Gehring ("Gehring"). Shortly after Gehring's tenure began, the College completed its search for an oceanography professor and hired Dr. Marie DeAngelis ("DeAngelis"). In addition, the College hired David Pushkin, a male of Russian descent, as a physics lab technician.

In the fall of 2004, one of the Science Department's remaining three physics professors, Dr. Abraham Silverman ("Silverman"), took a leave of absence due to illness. At his deposition, Weiss testified that he was aware of Silverman's illness when he made his recommendation not to grant Syrkin tenure. Silverman returned for the spring 2005 semester, but resigned thereafter. Now short-handed, the Science Department embarked on a search for a replacement; the College ultimately hired Dr. Ilona Gat ("Gat"), a woman of Romanian ancestry, who began teaching in the fall of 2005.

## C. The College's Financial Position

Enrollment at the College dropped from around 1200 full-time students in the early 1980s to less than 600 in the late 1990s. As a result of this downturn, the College

7

ran deficits throughout the 1990s. SUNY's central administration seriously considered declaring a state of "fiscal exigency," which would have allowed the College to dismiss even tenured faculty. Aff. of Kimberly R. Cline ¶ 10.[3] Instead, SUNY and the College entered into a long-term "transition plan" in 1999. Colucci Affirmation, Ex. 1. SUNY, for its part, agreed to provided a one-time cash injection of $2,000,000; in return, the College was expected to take specific steps to increase enrollment (and thereby increase revenues) and contain costs.

One of the steps taken by the College was an increased focus on female enrollment at the traditionally male institution. A 2000 memorandum of understanding ("MOU") between the College and SUNY expressed the expectation that by 2005 "[u]p to 25% of the student body will be women and/or minorities." Colucci Affirmation, Ex. 3. A draft of an amended MOU prepared in April 2006 referenced the MES program as a means of increasing female enrollment:

> The College believes that as its programs grow, particularly in International Trade and Transportation *and Marine Environmental Science*, the percentage of female students will increase, which in itself will create a more welcoming environment and make it easier to improve the campus' gender balance.

Decl. of James M. Maloney, Ex. 3 (emphasis added).

---

[3]Kimberly R. Cline ("Cline") was the College's Chief Operating Officer from 1999 to 2005. Syrkin notes that Cline's statement that SUNY considered declaring a state of fiscal exigency is not corroborated; nevertheless, given her position, Cline is certainly competent to state what she knew about the state of the College's finances.

8

The College's transition plan has had some success. Since the plan's adoption, enrollment has steadily increased, from 568 for the 1999-2000 academic year to 1120 for the 2005-2006 academic year; for the 2003-2004 academic year (when Syrkin would have begun his tenure), enrollment stood at 902. In addition, the College has maintained a balanced budget since 1999.

**D. Procedural History**

Following King's affirmance of Craine's decision, Syrkin filed a charge with the Equal Employment Opportunity Commission ("EEOC"). On July 13, 2004, the EEOC issued a determination that there was "reasonable cause to believe" that Syrkin had been terminated "based on his age, sex, religion and national origin." Maloney Decl., Ex. 1. In support of that conclusion, the determination cited the grant of tenure to Olszewski and the hiring of DeAngelis; it noted that the latter was inconsistent with Weiss' statement that the College could not support "one more full-time faculty member in the Science Department." *Id.* It also noted Hoffman's decision to seek an additional physics professor in October 2003, which it concluded was inconsistent with the College's "latest position that it discharged [Syrkin] due to reallocation of resources away from Physics and toward other disciplines." *Id.* The determination concluded by inviting the College "to join with it in an effort toward just resolution of this matter." *Id.*

After the EEOC's attempt at conciliation proved unsuccessful, it issued a right-to-sue letter on September 28, 2004. Syrkin then filed this action against SUNY and against King and Craine, in their official capacities. Alleging theories of discrimination based on sex, age, religion, national origin and protected speech, he sought both damages

9

and reinstatement under Title VII of the Civil Rights Act of 1964, as well as reinstatement under 42 U.S.C. § 1983.

By Memorandum and Order dated September 29, 2005, the Court dismissed all Title VII claims as time-barred and all claims against SUNY as barred by the Eleventh Amendment. *See Syrkin v. SUNY*, 2005 WL 2387819, at *9 (E.D.N.Y. Sept. 29, 2005). During discovery, Syrkin abandoned his claims that he was subjected to discrimination based on age, religion and protected speech. Thus, the only remaining claim is a § 1983 claim against King and Craine for sex and/or national-origin discrimination.[4]

## II

To succeed on a claim under § 1983, the plaintiff must show "(a) that the defendant is a 'person' acting 'under the color of state law,' and (b) that the defendant caused the plaintiffs to be deprived of a federal right." *Back v. Hastings On Hudson Union Free Sch. Dist.*, 365 F.3d 107, 122 (2d Cir. 2004) (citing *Monroe v. Pape*, 365 U.S. 167 (1961)). Craine and King do not dispute that they were, during the relevant time period, state actors for purposes of § 1983; nor is there any dispute that the Fourteenth Amendment's Equal Protection Clause protects against intentional discrimination based on either sex or national origin. *See Demoret v. Zegarelli*, 451 F.3d 140, 149 (2d Cir. 2006) ("We have held that

---

[4]As noted in the September 29th M&O, "'a state official acting in his official capacity may be sued in a federal forum to enjoin conduct that violates the federal Constitution, notwithstanding the Eleventh Amendment bar.'" *Syrkin*, 2005 WL 2387819, at *3 (quoting *Dube v. State Univ. of New York*, 900 F.2d 587, 595 (2d Cir. 1990)). Thus, Syrkin's request for reinstatement is not barred by the Eleventh Amendment because "'[r]einstatement is purely prospective injunctive relief that orders the state official to return the former employee to the state's payroll.'" *Id.* (quoting *Dwyer v. Regan*, 777 F.2d 825, 836 (2d Cir. 1985)).

sex-based discrimination may be actionable under § 1983 as a violation of equal protection."); *Hirabayashi v. United States*, 320 U.S. 81, 100 (1943) ("Distinctions between citizens solely because of their ancestry are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality."). Thus, the sole question is whether Syrkin has adduced sufficient evidence to support a finding that his termination was the result of such unlawful discrimination. In resolving this issue, the Court is mindful that, in the context of a summary judgment motion, it "must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the motion." *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).

Employment discrimination claims under § 1983 are evaluated under the familiar burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Back*, 365 F.3d at 123. The Second Circuit recently described that framework as follows:

> [T]he plaintiff bears the initial burden of establishing a prima facie case of discrimination. . . . If the plaintiff does so, the burden shifts to the defendant to articulate some legitimate, non-discriminatory reason for its action . . . . If such a reason is provided, plaintiff may no longer rely on the presumption raised by the prima facie case, but may still prevail by showing, without the benefit of the presumption, that the employer's determination was in fact the result of . . . discrimination.

*Holcomb v. Iona College*, 521 F.3d 130, 138 (2d Cir. 2008) (citations and internal quotation marks omitted). "Although intermediate evidentiary burdens shift back and forth under this framework, '[t]he ultimate burden of persuading the trier of fact that the defendant

11

intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000) (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981). "[I]n attempting to satisfy this burden, the plaintiff . . . must be afforded the 'opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.'" *Id.* (quoting *Burdine*, 450 U.S. at 253).

## A. Prima Facie Case

To make out a *prima facie* case of unlawful discrimination, Syrkin must show: "(1) that he belonged to a protected class; (2) that he was qualified for the position he held; (3) that he suffered an adverse employment action; and (4) that the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent." *Holcomb*, 521 F.3d at 138. This burden is "not onerous." *Burdine*, 450 U.S. at 253.

Defendants do not dispute that Syrkin has satisfied the first three elements. With respect to the fourth element, Syrkin argues that the College's stated goal of increasing female enrollment included a tacit effort to change the gender mix of the faculty; in support of this theory, he points to the decisions to grant tenure to Olszewski and to hire DeAngelis and Gat. In response, defendants contend that these later staffing decisions were made in different circumstances by different decisionmakers.

A plaintiff seeking to raise an inference of discrimination by showing that preferential treatment was given to individuals outside her protected group "must show she was 'similarly situated in all material respects' to the individuals with whom she seeks to compare herself." *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000) (quoting

12

*Shumway v. United Parcel Serv.*, 118 F.3d 60, 64 (2d Cir. 1997)). "Whether two employees are similarly situated ordinarily presents a question of fact for the jury," *id.* at 39 (citations omitted); however, "a court can properly grant summary judgment where it is clear that no reasonable jury could find the similarly situated prong met." *Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 499 n.2 (2d Cir. 2001).

As the Second Circuit has explained, making meaningful comparisons among a university's staffing decisions is difficult:

> Because of the decentralized nature of the decision-making process, comparisons which might tend to show unlawful discrimination are hard to come by. A denial of tenure by an English department simply cannot be compared with a grant of tenure in the physics or history departments. Even within a single department comparisons are difficult because the number of decisions within a particular period may be quite few, the decisions sometimes may be non-competitive and tenure files typically contain positive as well as negative evaluations, often in extravagant terms, sufficient to support either a grant or denial of tenure.

*Zahorik v. Cornell Univ.*, 729 F.2d 85, 93 (2d Cir. 1984). Although the decision to deny Syrkin tenure was not based on any dispute about his academic credentials, some of the problems identified in *Zahorik* remain:

Olszewski and DeAngelis, for example, are not sufficiently similar to Syrkin to support any inference of discrimination because they are not physics professors; Olsewski is a chemist and DeAngelis was hired as an oceanographer. That the College decided to retain the Science Department's only full-time chemist and to hire an oceanography professor as part of a move to expand the MES program simply does not say anything about why it decided not to grant Syrkin tenure; nor does it call into question

defendants' contention that the department had more physics professors than it needed to meet its teaching needs.

The hiring of Gat stands on a somewhat different footing because she was hired to teach physics. "[T]he mere fact that a plaintiff was replaced by someone outside the protected class will suffice for the required inference of discrimination at the *prima facie* stage of the . . . analysis." *Zimmermann v. Associate First Capital Corp.*, 251 F.3d 376, 381 (2d Cir. 2001). Gat did not, however, "replace" Syrkin in any reasonable sense of the word. She was hired some two years after Syrkin was terminated, by which time Weiss had been replaced by Kraushaar and then Gehring, and Craine had been replaced by Ryan; "when different decision-makers are involved, two decisions are rarely similarly situated in all relevant respects." *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 618 (7th Cir. 2000). In addition, two other physics professors – Stanton and Silverman – had left. Syrkin argues that Weiss' knowledge that Silverman was ill when Syrkin came up for tenure in the spring of 2002 supports an inference that Silverman's retirement was foreseeable; however, Silverman did not actually resign until the spring of 2005. In any event, Syrkin does not dispute that Stanton's retirement was unexpected.

In sum, the decisions to grant Olszewski tenure and to hire DeAngelis and Gat are simply too attenuated from the decision not to grant Syrkin tenure to allow for any reasonable inference concerning Weiss and Craine's motives. Accordingly, the Court concludes that Syrkin has failed to establish the fourth element of his *prima facie* case.

## B. Pretext

Defendants contend that the decision not to grant Syrkin tenure was based solely on an assessment of the College's reduced need for full-time physics professors in light of its enrollment and budget. Even assuming *arguendo* that Syrkin had established a *prima facie* case, he has not offered sufficient evidence to show that this legitimate, non-discriminatory reason was a pretext for unlawful discrimination.

As an initial matter, the Court notes that "a reason cannot be proved to be a pretext *for discrimination* unless it is shown *both* that the reason was false, *and* that discrimination was the real reason." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993) (internal quotations omitted; emphasis in original). Nevertheless, "[p]roof that the defendant's explanation is unworthy of credence is ... one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive." *Reeves*, 530 U.S. at 147. "Thus, a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's justification is false, *may* permit the trier of fact to conclude that the employer unlawfully discriminated," *id.* at 148 (emphasis added); on the other hand, "there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory." *Id.* The Second Circuit has held that "the Supreme Court's decision in *Reeves* clearly mandates a case-by-case approach, with a court examining the entire record to determine whether the plaintiff could satisfy his 'ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff.'" *Schnabel v. Abramson*, 232 F.3d 83, 90 (2d Cir. 2000) (quoting *Reeves*, 530 U.S.

15

at 143).

Syrkin offers several reasons why the proffered non-discriminatory reason for his termination is pretextual, but none of them is persuasive. First, he argues that the College's programmatic needs and budgetary constraints have been "posited in hindsight to justify the decision" not to grant him tenure. Pl.'s Mem. of Law, at 17. This contention is belied by Weiss' contemporaneous recommendation memorandum, which explicitly mentioned "the challenge of supporting numerous programs, despite limited financial resources." Colucci Affirmation, Ex. 19.

Syrkin next contends that hiring DeAngelis and Gat was inconsistent with Weiss' stated opinion that "the College should not continue to support an additional full time faculty member in the Science Department," Colucci Affirmation, Ex. 19; hiring DeAngelis was also inconsistent with Weiss' stated opposition to the MES program. Weiss, however, was not the one who authorized the candidate search that resulted in DeAngelis' and Gat's hiring. The authorization to hire DeAngelis was made by Kraushaar, who (1) had been given a significantly larger budget than Weiss, and (2) believed that the MES program should be expanded. The authorization to hire Gat was made by Gehring after the Science Department unexpectedly found itself short of full-time physics professors. Just as these materially changed circumstances precluded any reasonable inference of disparate treatment, so also are they insufficient to call into question Weiss' *bona fides* at the time he recommended against granting Syrkin tenure.

Finally, Syrkin points to Weiss' reference to the MES program in his recommendation memorandum. Given that all parties agree that the program had nothing

to do with Syrkin's position, the reference is certainly puzzling. Although Weiss plausibly explained in his affidavit that he viewed both the MES program and the personnel costs of the Science Department as evidence of a need to make cuts in the department, a jury could also reasonably conclude that Weiss mistakenly believed that Syrkin was associated with a program that he wished to eliminate. A reasonable jury might even conclude that Weiss intentionally tied Syrkin to the program to bolster his case not to grant tenure. But taking the record as a whole, no reasonable jury could infer from the reference that Weiss made his recommendation based on Syrkin's sex or national origin. *See St. Mary's Honor Ctr.*, 509 U.S. at 519 ("It is not enough, in other words, to *dis*believe the employer; the factfinder must *believe* the plaintiff's explanation of intentional discrimination.").

In sum, the defendants have made a compelling case that the College had more physics professors than it needed or could afford when Syrkin came up for tenure: Neither Syrkin nor Stanton was replaced and, despite increasing enrollment and decreasing financial pressure, the Science Department has been held to a maximum of three full-time physics professors since January 2003. Syrkin has not produced sufficient evidence to carry his ultimate burden at trial of proving that this allocation of resources was a pretext for unlawful discrimination.[5]

---

[5]The Court is aware of the EEOC's determination in this case; however, the EEOC simply cited to undisputed facts and provided no explanation for its conclusion. Numerous courts have held that when EEOC determinations "only report 'bare conclusions,' they have little probative value." *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1284 (9th Cir. 2000) (citing *Cortes v. Maxus Exploration Co.*, 977 F.2d 195, 201-02 (5th Cir. 1992), and *Goldberg v. B. Green & Co.*, 836 F.2d 845, 848 (4th Cir. 1988)); *see also Rider v. General Motors Corp.*, 2006 WL 1520084, at *9 (W.D.N.Y. May 26, 2006) ("[T]he court need not accord conclusive weight to the EEOC determination."); *Cook v. Deloitte &*

# III

Defendants' motion for summary judgment is granted and Syrkin's complaint is dismissed.

**SO ORDERED.**

s/Frederic Block
_____
FREDERIC BLOCK
Senior United States District Judge

Brooklyn, New York
September 8, 2008

---

*Touche, LLP*, 2005 WL 2429422, at *13 (S.D.N.Y. Sept. 30, 2005) ("[T]he EEOC Determination cannot fill the gaps in [plaintiff's] attempted prima facie showing of actual disability in this case.").